## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ERNESTO MEDINA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NCB MANAGEMENT SERVICES, INC.,<br><br>Defendant. | Case No. 23-1270<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Ernesto Medina ("Plaintiff"), individually and on behalf of all others similarly situated, asserts the following against Defendant NCB Management Services, Inc. ("NCB" or "Defendant"), based upon personal knowledge, where applicable, information and belief, and the investigation of counsel.

## INTRODUCTION

1.      Plaintiff brings this class action complaint against Defendant for its (i) failure to properly secure and safeguard highly valuable, protected personally identifiable information, including, without limitation, first and last names, addresses, phone numbers, email addresses, dates of birth, employment positions, pay amounts, driver's license numbers, Social Security numbers, account numbers, credit card numbers, routing numbers, account balances, and/or account statuses (collectively "PII"); (ii) failure to comply with industry standards to protect information systems that contain PII; (iii) unlawful disclosure of Plaintiff's and Class Members' PII; and (iv) failure to provide adequate notice to Plaintiff and Class Members that their PII had been disclosed and compromised.

1

2.      NCB is a national accounts receivable management company that provides account services to companies, such as Bank of America.

3.      On February 4, 2023, NCB discovered that an unauthorized party gained access to their systems on February 1, 2023 (the "Data Breach").

4.      As a result of NCB's failures and lax security protocols, hackers gained access to NCB's computer systems and/or servers and were able to steal the PII of Plaintiff and Class Members.

5.      The Data Breach was a direct and proximate result of NCB's flawed configuration and design of their servers and systems and their failure to implement and follow basic security procedures.

6.      Because of NCB's failures, unauthorized individuals were able to access and pilfer Plaintiff's and Class Members' PII.

7.      As a result, Plaintiff and Class Members are at substantially increased risk of future identity theft, both currently and for the indefinite future.  Plaintiff's and Class Members' PII, including but not limited to their driver's license and Social Security numbers, that were compromised by cyber criminals in the Data Breach, is highly valuable because it is unique, readily useable to commit fraud and identity theft, and difficult to replace.

8.      Plaintiff, on behalf of himself and all others similarly situated, brings claims for negligence, negligence *per se*, breach of implied contract, unjust enrichment, violations of state consumer protection statutes, the Driver's Privacy Protection Act ("DPPA"), and injunctive relief claims.

9.      Plaintiff seeks damages and injunctive relief requiring NCB to adopt reasonably sufficient practices to safeguard the PII that remains in NCB's custody in order to prevent incidents like the Data Breach from reoccurring in the future.

10.     Given that information relating to the Data Breach, including the servers and systems that were impacted, and the configuration and design of Defendant's servers and systems remain exclusively in Defendant's control, Plaintiff anticipates additional support for his claims will be uncovered following a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

11.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as it arises under the laws of the United States, including the Driver's Privacy Protection Act, 18 U.S.C. §§ 2721, *et seq.*

12.     This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C § 1332(d), because the amount in controversy for the Class exceeds $5,000,000, exclusive of interest and costs, there are more than 100 putative Members of the Class defined below, and a significant portion of putative Class Members are citizens of a different state than Defendant.

13.     The Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims are related to claims in the action within such original jurisdiction, and they form part of the same case or controversy under Article III of the United States Constitution.

14.     This Court has personal jurisdiction over Defendant NCB because Defendant NCB is a domestic Pennsylvania corporation, with its principal place of business located in Pennsylvania.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

16.     Plaintiff's claims also arise out of or relate to Defendant's contacts with California. Defendant has intentionally created extensive contacts with California through its deliberate servicing, marketing, and sale of its services in the forum.

## PARTIES

### I.     Plaintiff

17.     Plaintiff Ernesto Medina ("Plaintiff Medina") is a citizen and resident of the State of California.

18.     Plaintiff Medina was notified of the Data Breach and the impact to his PII by NCB via U.S. Mail in a letter dated March 24, 2023. Plaintiff Medina's PII was disclosed without his authorization to unknown third parties as a result of the Data Breach.

19.     As a result of the Data Breach, Plaintiff Medina has spent time and effort researching the Data Breach and reviewing and monitoring his account for fraudulent activity.

20.     Plaintiff Medina places significant value on the security of his PII. Plaintiff Medina entrusted his PII to NCB with the understanding that NCB would keep his information secure and employ reasonable and adequate security measures to ensure that it would not be compromised.

21.     Plaintiff Medina and Class Members suffered actual damages as a result of the failures of NCB to adequately protect the sensitive information entrusted to it, including, without limitation, time related to monitoring their accounts for fraudulent activity, exposure to increased and imminent risk of fraud and identity theft, the loss in value of his personal information, and

other economic and non-economic harm.  Plaintiff Medina and Class Members will now be forced to expend additional time to review their credit reports and monitor their accounts for fraud or identity theft.

22.    As a result of the Data Breach, Plaintiff Medina has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. Such risk is certainly real and impending and is not speculative given the highly sensitive nature of the PII compromised by the Data Breach.

**II.    Defendant**

23.    Defendant NCB Management Services, Inc. ("NCB") is a corporation organized under the laws of Pennsylvania, with its headquarters and principal place of business located at 1 Allied Drive, Trevose, Pennsylvania. Founded in 1994, NCB is a provider of Accounts Receivable Management ("ARM") and Call Center Management ("CCM") solutions, as well as a national debt buyer.

<u>**ALLEGATIONS**</u>

**I.    The Data Breach**

24.     On or around March 24, 2023, NCB announced that confidential client account information maintained by NCB was accessed by an unauthorized party (the "Data Breach").

25.    NCB discovered on February 4, 2023 that an unauthorized party gained access to NCB's systems on February 1, 2023. NCB confirmed on March 8, 2023 that client information previously connected with Plaintiff's and Class Members' Bank of America accounts were accessed by the unauthorized party.

26.    According to NCB's records, the PII involved included first and last names, addresses, phone numbers, email addresses, dates of birth, employment positions, pay amounts,

driver's license numbers, Social Security numbers, account numbers, credit card numbers, routing numbers, account balances, and/or account statuses of Plaintiff and Class Members.

27.    NCB began notifying affected consumers of the Data Breach, including Plaintiff and Class Members, by U.S. mail on or around March 24, 2023.

**II.    NCB Obtains, Collects, and Stores Plaintiff's and Class Members' PII**

28.    In the ordinary course of doing business as a national accounts receivable management company that provides account services to companies, such as Bank of America, NCB regularly obtains, collects, and stores sensitive, personal, and private protected information, such as the PII involved here.

29.    NCB designed and configured its servers and systems in such a way that allowed it to be susceptible to cyber-attack. NCB was in complete operation, control, and supervision of its servers and systems. NCB intentionally configured and designed its servers and systems, without regard to Plaintiff's and Class Members' PII which was disclosed to cyber criminals.

30.    By obtaining, using, disclosing, and deriving a benefit from Plaintiff's and Class Members' PII, NCB assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' PII from disclosure.

31.    Thus, NCB had access to Plaintiff's and Class Members' PII, that was stored on their servers and systems, which it then disclosed.

32.    Plaintiff and Class Members reasonably expect that national accounts receivable management companies such as NCB will use the utmost care to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

33.     NCB failed to prioritize data and cyber security by adopting reasonable data and cyber security measures to prevent and detect the unauthorized access to Plaintiff's and Class Members' PII.

34.     Had NCB remedied the security deficiencies, followed industry guidelines, and adopted security measures recommended by experts in the field, NCB would have prevented intrusion into its information servers and systems and, ultimately, the theft of Plaintiff's and Class Members' confidential PII.

**III.    NCB's Data Security Failures Caused the Data Breach**

35.     Up to, and including, the period when the Data Breach occurred, NCB breached its duties, obligations, and promises to Plaintiff and Class Members by its failure to:

  a.  hire qualified personnel and maintain a system of accountability over data security, thereby knowingly allowing data security deficiencies to persist;

  b.  properly train its employees about the risk of cyberattacks and how to mitigate them, including by failing to implement adequate security awareness training that would have instructed employees about the risks of common techniques, what to do if they suspect such attacks, and how to prevent them;

  c.  address well-known warnings that its systems and servers were susceptible to a data breach;

  d.  implement certain protocols that would have prevented unauthorized programs, such as malware and ransomware, from being installed on its servers and systems that accessed customers' personal information and otherwise would have protected customers' sensitive personal information;

    e.   install software to adequately track access to its network, monitor the network for unusual activity, and prevent exfiltration of data, which would have detected the presence of hackers and prevented customers' sensitive personal information from being stolen. Specifically, there are recommended, available measures to prevent data from leaving protected systems and being sent to untrusted networks outside of the corporate systems; and

    f.   adequately safeguard customers' sensitive personal information and maintain an adequate data security environment to reduce the risk of a data breach or unauthorized disclosure.

36.    Up to, and including, the period when the Data Breach occurred, NCB breached its duties, obligations, and promises to Plaintiff and Class Members by its failure to oversee the entrustment of Plaintiff's and Class Members' PII.

## IV.   NCB's Data Security Failures Constitute Unfair and Deceptive Practices and Violations of Consumers' Privacy Rights

37.    Defendant is prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The U.S. Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

38.    The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

39.    The FTC provides cybersecurity guidelines for businesses, advising that businesses should protect personal customer information, properly dispose of personal information that is no

longer needed, encrypt information stored on networks, understand their network's vulnerabilities, and implement policies to correct any security problems.

40.     The FTC further recommends companies not maintain PII longer than is needed for authorization of a transaction, limit access to private data, require complex passwords to be used on networks, use industry-tested methods for security, monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.

41.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act.  Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

42.     Defendant failed to properly implement basic data security practices.  Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to consumer PII or to prevent the disclosure of such information to unauthorized individuals, as reflected by the sensitive driver's license numbers and Social Security numbers stolen, constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

43.     Defendant was always fully aware of its obligations to protect the PII of consumers because of its business of obtaining, collecting, and disclosing PII as well as collecting, storing, and using other confidential personal and financial information.  Defendant was also aware of the significant repercussions that would result from its failure to do so.

44.     The FTC deems the failure to employ reasonable and appropriate measures to protect against unauthorized access to sensitive personal information an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

45.     In 2007, the FTC published guidelines that establish reasonable data security practices for businesses. The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed; encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies for installing vendor-approved patches to correct security problems. The guidelines also recommend that businesses consider using an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone may be trying to hack the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

46.     The FTC has also published a document entitled "FTC Facts for Business," which highlights the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.

47.     The FTC has issued orders against businesses that have failed to employ reasonable measures to secure sensitive personal information. These orders provide further guidance to businesses regarding their data security obligations.

48.     Prior to the Data Breach and during the breach itself, NCB failed to follow guidelines set forth by the FTC and actively mishandled the management of its IT security. Furthermore, by failing to have reasonable data security measures in place, NCB engaged in an unfair act or practice within the meaning of Section 5 of the FTC Act.

## V.    The Value of the Disclosed PII and Effects of Unauthorized Disclosure

49.    Defendant understood the protected PII it acquires, stores, and utilizes is highly sensitive and of significant value to the owners of the PII and those who would use it for wrongful purposes.

50.    PII is a valuable commodity to identity thieves, particularly when it is aggregated in large numbers. Former United States Attorney General William P. Barr made clear that consumers' sensitive personal information commonly stolen in data breaches "has economic value." The purpose of stealing large caches of personal data is to use it to defraud individuals or to place it for illegal sale and  profit from other criminals who buy the data and use it to commit fraud and identity theft. Indeed, cyber criminals routinely post stolen personal information on anonymous websites, making the information widely available to a criminal underworld.

51.    There is an active and robust market for this information. As John Sancenito, President of *Information Network Associates*, a company which helps companies with recovery after data breaches, explained after a data breach "[m]ost of the time what [data breach hackers] do is they steal the data and then they sell the data on the dark web to the people who actually commit the fraud."

52.    Some of the forms of PII involved in this Data Breach are particularly concerning. Unique Social Security and driver's license numbers cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in a major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies, in order to update the person's accounts with those entities.

53.     ***Driver's license numbers***—which were compromised as a result of the Data Breach—are highly sought after by cyber criminals on the dark web because they are unique to a specific individual, extremely sensitive, and cannot easily be replaced.

54.     *Experian*, a globally recognized credit reporting agency, has explained "[n]ext to your Social Security number, your driver's license number is one of the most important pieces of information to keep safe from thieves." This is because a driver's license number is connected to an individual's vehicle registration, insurance policies, records on file with the Department of Motor Vehicles, and other government agencies, financial institutions, places of employment, doctor's offices, and other entities.

55.     For these reasons, driver's license numbers are highly sought out by cyber criminals because they are one of the most valuable pieces of information to facilitate identity theft and fraud. This information is valuable because cyber criminals can use this information to open credit card accounts, obtain insurance policies and submit fraudulent claims, open cell phone contracts, file fraudulent tax returns, file unemployment applications, as well as obtain bank loans under a person's name.

56.     ***Social Security numbers***—which were compromised as a result of the Data Breach—are highly sought after by cyber criminals on the dark web because they are unique to a specific individual and extremely sensitive and cannot easily be replaced.

57.     Indeed, even the Social Security Administration ("SSA") warns that the process of replacing a Social Security number is a difficult one that creates other types of problems, and that it will not be a panacea for the affected person:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records

under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.

If you receive a new Social Security Number, you should not be able to use the old number anymore.

For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.

58.     Social Security numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often Social Security numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes Social Security numbers a prime target for cyber criminals and a particularly attractive form of PII to steal and then sell.

59.     The ramifications of Defendant's failure to keep Plaintiff's and Class Members' PII secure are long lasting and severe. To avoid detection, identity thieves often hold stolen data for months or years before using it. Also, the sale of stolen information on the "dark web" may take months or more to reach end-users, in part because the data is often sold in small batches as opposed to in bulk to a single buyer. Thus, Plaintiff and Class Members must vigilantly monitor their financial accounts *ad infinitum*.

60.     Thus, NCB knew, or should have known, the importance of safeguarding the PII entrusted to it and of the foreseeable consequences if its servers and systems were breached. However, NCB failed to take adequate cybersecurity measures to prevent the Data Breach from occurring.

61.     As highly sophisticated parties that handle sensitive PII, NCB failed to establish and/or implement appropriate administrative, technical and/or physical safeguards to ensure the security and confidentiality of Plaintiff's and other Class Members' PII to protect against anticipated threats of intrusion of such information.

62.     Identity thieves use stolen PII for various types of criminal activities, such as when personal and financial information is used to commit fraud or other crimes, including credit card fraud, phone or utilities fraud, bank fraud, and government fraud.

63.     The PII exfiltrated in the Data Breach can also be used to commit identity theft by placing Plaintiff and Class Members at a higher risk of "phishing," "vishing," "smishing," and "pharming," which are other ways for cyber criminals to exploit information they already have in order to get even more personally identifying information from a person through unsolicited email, text messages, and telephone calls purportedly from a legitimate company requesting personal, financial, and/or login credentials.

64.     There is often a lag time between when fraud occurs versus when it is discovered and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

65.     PII is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the cyber black market for years.

66.     Plaintiff and Class Members rightfully place a high value not only on their PII, but also on the privacy of that data.

67.     Thus, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

**VI.     The Driver's Privacy Protection Act**

68.     Defendant also had an obligation under the DPPA. The DPPA was enacted in 1994 in response to safety and privacy concerns stemming from the ready availability of personal information contained in state motor vehicle records. The DPPA was passed in the backdrop of the murder of actress Rebecca Schaeffer, whose murderer obtained her unlisted address through the California Department of Motor Vehicle ("DMV"). Additional concerns were raised when witnesses testified in hearings before Congress regarding the privacy of DMV information of domestic violence victims and law enforcement officers, among other safety concerns surrounding driver information. To address these concerns, the DPPA restricts the disclosure of personal information from motor vehicle records to certain permissible purposes expressly defined by the Act.

69.     The unauthorized disclosures of information have long been seen as injurious. The common law alone will sometimes protect a person's right to prevent the dissemination of private information. Indeed, it has been said that privacy torts have become well-ensconced in the fabric of American law. And with privacy torts, improper dissemination of information can itself constitute a cognizable injury. Because damages for a violation of an individual's privacy are a quintessential example of damages that are uncertain and possibly unmeasurable, causes of action such as the DPPA provide privacy tort victims with a monetary award calculated without the need of proving actual damages.

70.     The DPPA states that "[a] [s]tate department of motor vehicles, and any officer, employee, or contractor thereof, shall not knowingly disclose or otherwise make available to any

person or entity: (1) personal information, as defined in 18 U.S.C. 2725(3), about any individual obtained by the department in connection with a motor vehicle record, except as provided in subsection (b) of this section. . . ." 18 U.S.C. § 2721(a)(1).

71.    Defendant had an obligation to use reasonable security measures under the DPPA, which further states that "[i]t shall be unlawful for any person knowingly to obtain or disclose personal information, from a motor vehicle record, for any use not permitted under section 2721(b) of this title." 18 U.S.C. § 2722(a).

72.    Thus, the DPPA provides citizens with a private right of action, in the event that their private information is knowingly obtained, disclosed, or used in a manner other than for the enumerated permissible purposes. The DPPA states: "[a] person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter [18 U.S.C. §§ 2721, *et seq.*] shall be liable to the individual to whom the information pertains, who may bring a civil action in a United States district court." 18 U.S.C. § 2724(a).

73.    The default rule under the DPPA is non-disclosure. The DPPA is structured such that 18 U.S.C. § 2721(a)(1) and 18 U.S.C. § 2722(a) provide the general prohibition on the release and use of motor vehicle information, and § 2721(b) enumerates fourteen specific exceptions to the general prohibition. Disclosing information to cyber criminals is not one of them. Because the PII was disclosed to unauthorized individuals—*i.e.*, cyber criminals—there is no argument to be made that disclosure was "for a permissible purpose."

74.    If not for NCB's intentional configuration and design of its servers and systems, it would not have disclosed Plaintiff's and Class Members' PII to cyber criminals.

75.     The Data Breach was a direct and proximate result of NCB's flawed configuration and design of its servers and systems and for its failure to implement and follow basic security procedures.

**VII.     The Data Breach Damaged Plaintiff and Class Members**

76.     As a result of Defendant's deficient security measures, Plaintiff and Class Members have been harmed by the compromise of their sensitive personal information, which is likely currently for sale on the dark web and through private sale to other cyber criminals and/or being used by criminals for identify theft and other fraud-related crimes.

77.     Plaintiff and Class Members face a substantial and imminent risk of fraud and identity theft as their names have now been linked with their driver's license and Social Security numbers, email addresses, and addresses as a result of the Data Breach. These specific types of information are associated with a high risk of fraud.

78.     Many Class Members will also incur out of pocket costs for protective measures such as identity theft protection, credit monitoring fees, credit report fees, credit freeze fees, fees for replacement cards, and similar costs related to the Data Breach.

79.     Plaintiff and Class Members also suffered a "loss of value" of their sensitive personal information when it was stolen by hackers in the Data Breach. A robust market exists for stolen personal information. Hackers sell personal information on the dark web—an underground market for illicit activity, including the purchase of hacked personal information—at specific identifiable prices. This market serves as a means to determine the loss of value to Plaintiff and Class Members.

80.     Plaintiff's and Class Members' stolen personal information is a valuable commodity to identity thieves. William P. Barr, former United States Attorney General, made

clear that consumers' sensitive personal information commonly stolen in data breaches "has economic value." The purpose of stealing large caches of personal information is to use it to defraud consumers or to place it for illegal sale and to profit from other criminals who buy the data and use it to commit payment card fraud. One commentator confirmed, explaining that, "[m]ost of the time what [data breach hackers] do is they steal the data and then they sell the data on the dark web to the people who actually commit the fraud."

81.     Identity thieves can also combine data stolen in the Data Breach with other information about Plaintiff and Class Members gathered from underground sources, public sources, or even Plaintiff's and Class Members' social media accounts. Thieves can use the combined data to send highly targeted phishing emails to Plaintiff and Class Members to obtain more sensitive information. Thieves can use the combined data to commit potential crimes, including opening new financial accounts in Plaintiff's and Class Members' names, taking out loans in Plaintiff's and Class Members' names, using Plaintiff's and Class Members' information to obtain government benefits, filing fraudulent tax returns using Plaintiff's and Class Members' information, obtaining Social Security numbers in Plaintiff's and Class Members' names but with another person's photograph, and giving false information to police during an arrest.

82.     Plaintiff and Class Members have spent and will continue to spend substantial amounts of time monitoring their accounts for identity theft and fraud, the opening of fraudulent accounts, disputing fraudulent transactions, and reviewing their financial affairs more closely than they otherwise would have done but for the Data Breach. These efforts are burdensome and time-consuming, especially because NCB has failed to disclose how long the Data Breach lasted, forcing customers to continue to monitor their accounts indefinitely.

83.    Class Members who experience actual identity theft and fraud will also be harmed by the inability to use their credit or debit cards when their accounts are suspended or otherwise rendered unusable due to fraudulent charges. To the extent Class Members are charged monthly/annual fees for their credit and/or debit accounts, they are left without the benefit of that bargain while they await receipt of their replacement cards. Class Members will be harmed further by the loss of rewards points or airline mileage that they cannot accrue while awaiting replacement cards. The inability to use payment cards may also result in missed payments on bills and loans, late charges and fees, and adverse effects on their credit, including decreased credit scores and adverse credit notations.

84.    In the case of a data breach, merely reimbursing a consumer for a financial loss due to identity theft or fraud does not make that individual whole again. On the contrary, after conducting a study, the Department of Justice's Bureau of Justice Statistics ("BJS") found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems."

85.    A victim whose personal information has been stolen or compromised may not see the full extent of identity theft or fraud until long after the initial breach. Additionally, a victim whose personal information (including driver's license and Social Security numbers) has been stolen may not become aware of charges when they are nominal, as typical fraud-prevention algorithms may not capture such charges. Those charges may be repeated, over and over again, on a victim's account.

86.    To date, NCB has done little to provide Plaintiff and Class Members with relief for the damages they have suffered as a result of the Data Breach, including, but not limited to, the costs and loss of time they incurred because of the Data Breach. Defendant has only offered

two years of inadequate identity monitoring services, despite Plaintiff and Class Members being at risk of identity theft and fraud for the remainder of their lifetimes.

87.     The two years of credit monitoring offered to persons whose PII was compromised is wholly inadequate, as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud. What is more, Defendant places the burden squarely on Plaintiff and Class Members by requiring them to expend time signing up for that service, as opposed to automatically enrolling all victims of this Data Breach.

88.     The risk of identity theft and fraud will persist for years. Identity thieves often hold stolen data for months or years before using it to avoid detection. Also, the sale of stolen information on the dark web may take months or more to reach end-users, in part because the data is often sold in small batches to various individuals rather than in bulk to a single buyer. Thus, Plaintiff and Class Members must vigilantly monitor their financial accounts *ad infinitum*.

**VIII.     NCB's Failure to Notify Plaintiff and Class Members in a Timely or Adequate Fashion Exacerbated the Damages**

89.     As detailed above, NCB claims to have discovered the Data Breach on February 4, 2023, yet failed to begin notifying Plaintiff and Class Members until March 24, 2023, via U.S. Mail.

90.     This period of over a month could have been used by Plaintiff and Class Members to take steps to mitigate the damage caused by the Data Breach.

91.     Instead, NCB concealed the Data Breach for over a month, allowing the unauthorized third-party to potentially exploit Plaintiff's and Class Members' PII without any mitigation steps being taken.

92.     Plaintiff and Class Members were deprived of the opportunity to take any steps to prevent damage by NCB's concealment of the Data Breach and failure to provide timely and adequate notice of the Data Breach to Plaintiff and Class Members.

## CLASS ACTION ALLEGATIONS

93.     Plaintiff brings this case as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and (b)(3) on behalf of the following Nationwide Class:

> All persons in the United States whose personal information was compromised in the Data Breach made public by NCB in March 2023 (the "Nationwide Class").

94.     Plaintiff reserves the right to modify, expand or amend the above class definition, or to seek certification of a class or classes defined differently than above before any court determines whether certification is appropriate following additional investigation, discovery, or otherwise.

95.     Certification of Plaintiff's claims for class-wide treatment are appropriate because all elements of Fed. R. Civ. P. 23(a) and (b)(2)-(3) are satisfied. Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

96.     **Numerosity**. All requirements of Fed. R. Civ. P. 23(a)(1) are satisfied. The Members of the Nationwide Class are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. While Plaintiff is informed and believes that there are likely hundreds of thousands of Members of the Class, the precise number of Class Members is unknown to Plaintiff. According to information released by the Maine Attorney General, the number of persons affected is approximately 494,969. Class Members may be identified through objective means. Class Members may be notified of the pendency of this action by recognized,

court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

97.    **Commonality and Predominance**. All requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) are satisfied. This action involves common questions of law and fact, which predominate over any questions affecting individual Class Members, including, without limitation:

      a.    Whether Defendant engaged in active misfeasance and misconduct alleged herein;

      b.    Whether Defendant owed a duty to Class Members to safeguard their sensitive personal information;

      c.    Whether Defendant breached its duty to Class Members to safeguard their sensitive personal information;

      d.    Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

      e.    Whether Plaintiff and Class Members suffered legally cognizable damages as a result of the Data Breach;

      f.    Whether Defendant's failure to provide adequate security proximately caused Plaintiff's and Class Members' injuries; and

      g.    Whether Plaintiff and Class Members are entitled to declaratory and injunctive relief.

98.    **Typicality.** All requirements of Fed. R. Civ. P. 23(a)(3) are satisfied. Plaintiff's claims are typical of the claims of all Class Members because Plaintiff, like other Class and Members, suffered theft of his sensitive personal information in the Data Breach.

99.     **Adequacy of Representation.** All requirements of Fed. R. Civ. P. 23(a)(4) are satisfied. Plaintiff is an adequate Class representative because he is a Member of the Class and his interests do not conflict with the interests of other Class Members that he seeks to represent. Plaintiff is committed to pursuing this matter for the Class with the Class's collective best interest in mind. Plaintiff has retained counsel competent and experienced in complex class action litigation of this type and Plaintiff intends to prosecute this action vigorously. Plaintiff and his counsel will fairly and adequately protect the Class's interests.

100.     **Predominance and Superiority.** All requirements of Fed. R. Civ. P. 23(b)(3) are satisfied. As described above, common issues of law or fact predominate over individual issues. Resolution of those common issues in Plaintiff's case will also resolve them for the Class's claims. In addition, a class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Members of the Class to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

101.    **Cohesiveness**. All requirements of Fed. R. Civ. P. 23(b)(2) are satisfied. Defendant has acted, or refused to act, on grounds generally applicable to the Nationwide Class such that final declaratory or injunctive relief is appropriate.

## CLAIMS FOR RELIEF

### COUNT I
### NEGLIGENCE

102.    Plaintiff re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

103.    NCB obtained, collected, and stored Plaintiff's and Class Members' PII.

104.    By collecting and maintaining sensitive personal information, Defendant had a common law duty of care to use reasonable means to secure and safeguard the sensitive personal information and to prevent disclosure of the information to unauthorized individuals. Defendant's duty included a responsibility to implement processes by which it could detect a data breach of this type and magnitude in a timely manner.

105.    Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with the various statutory requirements, regulations, and other notices described above.

106.    Defendant was in a position to ensure that its servers and systems were sufficient to protect against the foreseeable risk that a data breach could occur that would result in substantial harm to Plaintiff and Class Members.

107.    Defendant was subject to an "independent duty" untethered to any contract between Plaintiff and Class Members and Defendant.

108.    Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect customers' sensitive personal information. Defendant's negligent acts and omissions include, but are not limited to, the following:

      a.    failure to employ systems and educate employees to protect against malware and/or ransomware;

      b.    failure to comply with industry standards for software and server security;

      c.    failure to track and monitor access to its network and personal information;

      d.    failure to limit access to those with a valid purpose;

      e.    failure to adequately staff and fund its data security operation;

      f.    failure to remove, delete, or destroy highly sensitive personal information of consumers that is no longer being used for any valid business purpose;

      g.    failure to use due care in hiring, promoting, and supervising those responsible for its data security operations; and

      h.    failure to recognize that hackers were stealing personal information from its network while the Data Breach was taking place.

109.    It was foreseeable to Defendant that a failure to use reasonable measures to protect its customers' sensitive personal information could result in injury to consumers. Further, actual and attempted breaches of data security were reasonably foreseeable to Defendant given the known frequency of data breaches and various warnings from industry experts.

110.    As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members sustained damages as alleged herein. Plaintiff and Class Members are entitled to compensatory, consequential, punitive, and nominal damages, in an amount to be proven at trial.

111.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, among other things: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems; and (iii) provide free credit monitoring and identity theft insurance to all Class Members for their lifetime.

## COUNT II
## NEGLIGENCE *PER SE*

112.    Plaintiff re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

### Negligence *Per Se* Under Section 5 of the FTC Act

113.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies such as Defendant for failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of Defendant's duty.

114.    Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with the industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and disclosed and the foreseeable consequences of a data breach.

115.    Plaintiff and Class Members are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

116.    Moreover, the harm that has occurred is the type of harm that the FTC Act was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class Members.

117.    Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

118.    As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have been injured as described herein and above and are entitled to damages, including compensatory, consequential, punitive, and nominal damages, in an amount to be proven at trial.

119.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, among other things: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems; and (iii) provide free credit monitoring and identity theft insurance to all Class Members for their lifetime.

### Negligence *Per Se* Under the DPPA

120.    The DPPA states that "[i]t shall be unlawful for any person knowingly to obtain or disclose personal information, from a motor vehicle record, for any use not permitted under section 2721(b) of this title." 18 U.S.C. § 2722(a).

121.    The DPPA also states that "[a] [s]tate department of motor vehicles, and any officer, employee, or contractor thereof, shall not knowingly disclose or otherwise make available to any person or entity: (1) personal information, as defined in 18 U.S.C. 2725(3), about any individual obtained by the department in connection with a motor vehicle record, except as provided in subsection (b) of this section. . . ." 18 U.S.C. § 2721(a)(1).

122.    As alleged herein, NCB utilizes PII obtained from motor vehicle records, including driver's license numbers.

123.    Under the DPPA, NCB owed a duty to Plaintiff and other Class Members to protect and not disclose their PII, including driver's license numbers, obtained from motor vehicle records.

124.    NCB violated the DPPA by intentionally configuring and designing its servers and systems to disclose Plaintiff's and Class Members' PII. NCB installed no protections or security measures to protect this information and willfully disclosed it to cyber criminals through the intentional configuration and design of its servers and systems. NCB's conduct was particularly unreasonable given the nature and amount of PII it obtained and disclosed and the foreseeable consequences of a data breach.

125.    Alternatively, NCB had constructive notice that it had disclosed the PII of Plaintiff and Class Members to unauthorized third parties because it should have been aware that configuring and designing its servers and systems to disclose Plaintiff's and Class Members' PII to cyber criminals would cause the disclosure of this information.

126.    At the very least, NCB was willfully ignorant that its servers and systems were configured without any protections to store Plaintiff's and Class Members' PII and would disclose that personal information to cyber criminals.

127.    Plaintiff and Class Members are within the class of persons that the DPPA was intended to protect against because the DPPA was expressly designed to protect a person's personal information contained in motor vehicle records from unauthorized disclosure.

128.    Moreover, the harm that has occurred is the type of harm the DPPA is intended to guard against, *i.e.*, the unauthorized disclosure of personal information from motor vehicle records.

129.    NCB's violation of the DPPA constitutes negligence *per se*.

130.    As a direct and proximate result of NCB's negligence, Plaintiff and Class Members have been injured, as described herein and above, and are entitled to damages,

including compensatory, consequential, punitive, and nominal damages, in an amount to be proven at trial.

131.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, among other things: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems; and (iii) provide free credit monitoring and identity theft insurance to all Class Members for their lifetime.

132.    Whether under the FTC Act or the DPPA, each independently constitutes negligence *per se*.

**COUNT III**
**BREACH OF IMPLIED CONTRACT**

133.    Plaintiff re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

134.    Plaintiff and Class Members were required to provide Defendant with their PII.

135.    By Plaintiff and Class Members providing their PII, and by Defendant accepting this PII, the parties mutually assented to implied contracts. These implied contracts included an implicit agreement and understanding that: (1) Defendant would adequately safeguard Plaintiff's and Class Members' PII from foreseeable threats; (2) Defendant would delete the PII of Plaintiff and Class Members once it no longer had a legitimate need; and (3) Defendant would provide Plaintiff and Class Members with notice within a reasonable amount of time after suffering a data breach.

136.    Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws, regulations, and industry standards when they entered into the implied contracts with NCB.

137.    Defendant provided consideration by providing it services, while Plaintiff and Class Members provided consideration by providing valuable property, their PII. Defendant benefitted from the receipt of this PII by increasing profit from additional business.

138.    Plaintiff and the Class Members fully performed their obligations under the implied contracts with Defendant.

139.    Plaintiff and Class Members would not have provided their PII to Defendant in the absence of Defendant's implied promise to keep their PII reasonably secure.

140.    Defendant breached its implied contracts with Plaintiff and Class Members by failing to implement reasonable data security measures.

141.    As a direct and proximate result of Defendant's breaches of the implied contracts, Plaintiff and Class Members sustained damages, as alleged above. Plaintiff and Class Members are entitled to compensatory, consequential, punitive, and nominal damages, in an amount to be proven at trial.

142.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, among other things: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems; and (iii) provide free credit monitoring and identity theft insurance to all Class Members for their lifetime.

## COUNT IV
## UNJUST ENRICHMENT

143.    Plaintiff re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

144.    Plaintiff and Class Members conferred a monetary benefit on Defendant by providing Defendant with their valuable PII.

145.    Defendant appreciated or had knowledge of the benefits conferred upon it by Plaintiff and Class Members. Defendant also benefited from the receipt of Plaintiff's and Class Members' sensitive PII, as this was utilized by Defendant as part of its account services it provided to companies. Defendant enriched itself by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII.

146.    Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

147.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the monetary value of the benefit belonging to Plaintiff and Class Members because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

148.    Defendant acquired the monetary benefit and PII through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

149.    If Plaintiff and Class Members knew that Defendant had not secured their PII, they would not have agreed to provide their PII to Defendant.

150.    Plaintiff and Class Members have no adequate remedy at law.

151.    As a direct and proximate result of Defendant's breaches of the implied contracts, Plaintiff and Class Members sustained damages as alleged above.

152.    In equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members because Defendant failed to oversee,

implement, or adequately implement, the data privacy and security practices and procedures that Plaintiff and Class Members paid for and were otherwise mandated by federal, state, and local laws and industry standards.

153.    Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds received by it as a result of the conduct and Data Breach alleged herein.

### COUNT V
### CALIFORNIA CUSTOMER RECORDS ACT
### Cal. Civ. Code §§ 1798.80, *et seq.*

154.    Plaintiff re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

155.    Plaintiff is a resident of California.

156.    "[T]o ensure that personal information about California residents is protected," the California legislature enacted Cal. Civ. Code § 1798.81.5, which requires that any business that "owns, licenses, or maintains personal information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the PII from unauthorized access, destruction, use, modification, or disclosure."

157.    Defendant is a business that owns, maintains, and licenses personal information (or "PII"), within the meaning of Cal. Civ. Code § 1798.81.5, about Plaintiff and Class Members.

158.    Businesses that own or license computerized data that includes PII, including Social Security numbers, are required to notify California residents when their PII has been acquired (or is reasonably believed to have been acquired) by unauthorized persons in a data security breach "in the most expedient time possible and without unreasonable delay." Cal. Civ.

Code § 1798.82. Among other requirements, the security breach notification must include "the types of PII that were or are reasonably believed to have been the subject of the breach." Cal. Civ. Code § 1798.82.

159.    Defendant is a business that owns or licenses computerized data that includes PII as defined by Cal. Civ. Code § 1798.82.

160.    Plaintiff's and Class Members' PII includes PII as covered by Cal. Civ. Code § 1798.82.

161.    Because Defendant reasonably believed that Plaintiff's and Class Members' PII was acquired by unauthorized persons during the Data Breach, Defendant had an obligation to disclose the Data Breach in a timely and accurate fashion, as mandated by Cal. Civ. Code § 1798.82.

162.    Defendant failed to fully disclose material information about the Data Breach, including the types of PII impacted, in a timely fashion.

163.    By failing to disclose the Data Breach in a timely and accurate manner, Defendant violated Cal. Civ. Code § 1798.82.

164.    As a direct and proximate result of Defendant's violations of the Cal. Civ. Code §§ 1798.81.5 and 1798.82, Plaintiff and Class Members suffered damages, as described above.

165.    Plaintiff and Class Members seek relief under Cal. Civ. Code § 1798.84, including actual damages and injunctive relief.

### COUNT VI
### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
### Cal. Bus. & Prof. Code §§ 17200, *et seq.*

166.    Plaintiff re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

167. Plaintiff is a resident of California.

168. Defendant is a "person" as defined by Cal. Bus. & Prof. Code §17201.

169. Defendant violated Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL") by engaging in unlawful, unfair, and deceptive business acts and practices.

170. Defendant's "unfair" acts and practices include:

    a.  Defendant failed to implement and maintain reasonable security measures to protect Plaintiff's and Class Members' PII from unauthorized disclosure, release, data breaches, and theft, which was a direct and proximate cause of the Data Breach;

    b.  Defendant failed to identify foreseeable security risks, remediate identified security risks, and adequately improve security following previous cybersecurity incidents, as described herein. This conduct, with little if any utility, is unfair when weighed against the harm to Plaintiff and Class Members, whose PII has been compromised;

    c.  Defendant's failure to implement and maintain reasonable security measures also was contrary to legislatively-declared public policy that seeks to protect consumers' data and ensure that entities that are trusted with it use appropriate security measures. These policies are reflected in laws, including the FTC Act, 15 U.S.C. § 45; Driver's Privacy Protection Act, 18 U.S.C. §§ 2721, *et seq.*; and California's Consumer Records Act, Cal. Civ. Code § 1798.81.5; and

    d.  Defendant's failure to implement and maintain reasonable security measures also resulted in substantial consumer injuries, as described above, that are not outweighed by any countervailing benefits to consumers or competition.

Moreover, because consumers could not know of Defendant's grossly inadequate security, consumers could not have reasonably avoided the harms that Defendant caused.

171. Defendant engaged in unlawful business practices by violating Cal. Civ. Code § 1798.82.

172. Defendant has engaged in "unlawful" business practices by violating multiple laws, including California's Consumer Records Act, Cal. Civ. Code §§ 1798.81.5 (requiring reasonable data security measures) and 1798.82 (requiring timely breach notification); the FTC Act, 15 U.S.C. § 45; the Driver's Privacy Protection Act, 18 U.S.C. §§ 2721, *et seq.*; and the common law.

173. Defendant's unlawful, unfair, and deceptive acts and practices include:

    a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Class Members' PII, which was a direct and proximate cause of the Data Breach;

    b. Failing to identify and remediate foreseeable security and privacy risks and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

    c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45 and Driver's Privacy Protection Act, 18 U.S.C. §§ 2721, *et seq.*, which was a direct and proximate cause of the Data Breach;

d.   Misrepresenting that they would protect the privacy and confidentiality of

Plaintiff's and Class Members' PII, including by implementing and

maintaining reasonable security measures;

e.   Misrepresenting that they would comply with common law and statutory

duties pertaining to the security and privacy of Plaintiff's and Class Members'

PII, including duties imposed by the FTC Act, 15 U.S.C. § 45 and Driver's

Privacy Protection Act, 18 U.S.C. §§ 2721, *et seq.*;

f.   Omitting, suppressing, and concealing the material fact that it did not

reasonably or adequately secure Plaintiff's and Class Members' PII; and

g.   Omitting, suppressing, and concealing the material fact that they did not

comply with common law and statutory duties pertaining to the security and

privacy of Plaintiff's and Class Members' PII, including duties imposed by

the FTC Act, 15 U.S.C. § 45; California's Consumer Records Act, Cal. Civ.

Code §§ 1798.80, *et seq.*, and 1798.81.5; and Driver's Privacy Protection Act,

18 U.S.C. §§ 2721, *et seq.*, which was a direct and proximate cause of the

Data Breach.

174.   Defendant's representations and omissions were material because they were likely

to deceive reasonable consumers about the adequacy of Defendant's data security and ability to

protect the confidentiality of consumers' PII.

175.   As a direct and proximate result of Defendant's unfair, unlawful, and fraudulent

acts and practices, Plaintiff and Class Members were injured and suffered monetary and non-

monetary damages, as described herein, including but not limited to fraud and identity theft, time

and expenses related to monitoring their financial accounts for fraudulent activity, an increased,

imminent risk of fraud and identity theft; loss of value of their PII, loss of the value of access to their PII, and the value of identity protection services made necessary by the Breach.

176.    Defendant acted intentionally, knowingly, and maliciously to violate California's Unfair Competition Law and recklessly disregarded Plaintiff's and Class Members' rights. Defendant's numerous past data breaches put it on notice that its security and privacy protections were inadequate.

177.    Plaintiff and Class Members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices or use of their PII, declaratory relief, reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5, injunctive relief, and other appropriate equitable relief.

**COUNT VII**
**PENNSYLVANIA UNFAIR TRADE PRACTICES AND**
**CONSUMER PROTECTION LAW**
**73 Pa. Cons. Stat. §§ 201-2 & 201-3, *et seq.***

178.    Plaintiff re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

179.    Plaintiff and Defendant are each a "person" as meant by 73 Pa. Cons. Stat. § 201-2(2).

180.    Defendant domestic Pennsylvania corporation with its headquarters in Trevose, Pennsylvania

181.    Plaintiff purchased goods and services in "trade" and "commerce," as meant by 73 Pa. Cons. Stat. § 201-2(3), primarily for personal, family, and/or household purposes.

182.    Defendant engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of its trade and commerce in violation of 73 Pa. Cons. Stat. Ann. § 201-3, including the following:

   a.    Representing that its goods and services have approval, characteristics, uses, or benefits that they do not have (73 Pa. Stat. Ann. § 201-2(4)(v));

   b.    Representing that its goods and services are of a particular standard or quality if they are another (73 Pa. Stat. Ann. § 201- 2(4)(vii)); and

   c.    Advertising its goods and services with intent not to sell them as advertised (73 Pa. Stat. Ann. § 201-2(4)(ix)).

183.    Defendant's unfair or deceptive acts and practices include:

   a.    Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Class Members' PII, which was a direct and proximate cause of the Data Breach;

   b.    Failing to identify and remediate foreseeable security and privacy risks and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

   c.    Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45 and Driver's Privacy Protection Act, 18 U.S.C. §§ 2721, *et seq.*, which was a direct and proximate cause of the Data Breach;

    d.   Misrepresenting that they would protect the privacy and confidentiality of Plaintiff's and Class Members' PII, including by implementing and maintaining reasonable security measures;

    e.   Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45 and Driver's Privacy Protection Act, 18 U.S.C. §§ 2721, *et seq.*;

    f.   Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Class Members' PII; and

    g.   Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45 and Driver's Privacy Protection Act, 18 U.S.C. §§ 2721, *et seq.*

184.    Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of consumers' PII.

185.    Defendant intended to mislead Plaintiff and Class Members and induce them to rely on its misrepresentations and omissions.

186.    Had Defendant disclosed to Plaintiff and Class Members that its data systems were not secure and, thus, vulnerable to attack, Defendant would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Defendant was trusted with sensitive and valuable PII regarding hundreds of

thousands of consumers, including Plaintiff and Class Members. Defendant accepted the responsibility of protecting the data while keeping the inadequate state of its security controls secret from the public. Accordingly, Plaintiff and Class Members acted reasonably in relying on Defendant's misrepresentations and omissions, the truth of which they could not have discovered.

187.    Defendant acted intentionally, knowingly, and maliciously to violate Pennsylvania Unfair Trade Practices and Consumer Protection Law, and recklessly disregarded Plaintiff's and Class Members' rights.

188.    As a direct and proximate result of Defendant's unfair methods of competition and unfair or deceptive acts or practices and Plaintiff's and Class Members' reliance on them, Plaintiff and Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including but not limited to fraud and identity theft, time and expenses related to monitoring their financial accounts for fraudulent activity, an increased, imminent risk of fraud and identity theft, loss of value of their PII, loss of the value of access to their PII, and the value of identity protection services made necessary by the Data Breach.

189.    Plaintiff and Class Members seek all monetary and non-monetary relief allowed by law, including, pursuant to 73 Pa. Stat. Ann. § 201-9.2, actual damages or statutory damages of $100 (whichever is greater), treble damages, attorneys' fees and costs, and any additional relief the Court deems necessary or proper.

## COUNT VIII
## VIOLATION OF DPPA
## 18 U.S.C. §§ 2721, *et seq.*

190.    Plaintiff re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

191.    Pursuant to 18 U.S.C. § 2722(a), "[i]t shall be unlawful for any person knowingly to obtain or disclose personal information, from a motor vehicle record, for any use not permitted under section 2721(b) of this title."

192.    Pursuant to 18 U.S.C. § 2721(a)(1), "[a] [s]tate department of motor vehicles, and any officer, employee, or contractor thereof, shall not knowingly disclose or otherwise make available to any person or entity: personal information, as defined in 18 U.S.C. 2725(3), about any individual obtained by the department in connection with a motor vehicle record, except as provided in subsection (b) of this section."

193.    The DPPA provides a civil cause of action against "a person who knowingly obtains, discloses, or uses personal information, from a motor vehicle record for a purpose not permitted" under the statute. 18 U.S.C. § 2724(a).

194.    "Person" is defined as "an individual, organization or entity." 18 U.S.C. § 2725(2). NCB is a "person" under the DPPA.

195.    "Personal information" is defined as "information that identifies an individual, including an individual's . . . driver identification number. . ." 18 U.S.C. § 2725(3). Plaintiff's and Class Members' PII, which includes driver's license numbers, is "personal information" under the DPPA.

196.    "Motor vehicle record" is defined as "any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by

a department of motor vehicles." 18 U.S.C. § 2725(1). NCB obtains motor vehicle records containing Plaintiff's and Class Members' PII, including their driver's license numbers.

197.     NCB obtains motor vehicle records as part of its business operations.

198.     NCB's disclosure of Plaintiff's and Class Members' personal information to unauthorized individuals violated 18 U.S.C. §§ 2722(a) and/or 2721(a)(1).

199.     NCB's disclosure of personal information was not a permitted use under 18 U.S.C. § 2721(b).

200.     NCB knowingly obtained and/or disclosed Plaintiff's and Class Member's personal information, which came from a motor vehicle record, for a purpose not permitted under the DPPA.

201.     NCB knowingly and voluntarily configured and designed its servers and systems to disclose Plaintiff's and Class Members' PII to cyber criminals in direct violation of the DPPA.

202.     NCB installed no protections or security measures to protect this exposed information and willfully disclosed it to cyber criminals through the intentional configuration and design of its servers and systems.

203.     Alternatively, NCB had constructive notice that it had disclosed the PII of Plaintiff and Class Members to unauthorized third parties because it should have been aware that configuring and designing its servers and systems to disclose Plaintiff's and Class Members' PII to unauthorized parties or other security protections would cause the disclosure of this information.

204.     At the very least, NCB was willfully ignorant that its servers and systems were configured and designed without any protections to store Plaintiff's and Class Members' PII and would disclose that personal information to cyber criminals.

205.    Merriam-Webster's dictionary defines "disclose" as "to make known or public," "to expose to view," or, alternatively, "to open up." None of these definitions requires an identified intended recipient. Instead, disclosure is the act of exposure. Whether or not NCB meant for identifiable third parties to access the information is not relevant. All that is required for a knowing disclosure is a voluntary action.

206.    Pursuant to 18 U.S.C. § 2724(b)(1)-(4), Plaintiff seeks on behalf of himself and members of the Class: (1) actual damages, not less than statutory liquidated damages in the amount of $2,500; (2) punitive damages; (3) reasonable attorneys' fees and costs; and (4) preliminary and equitable relief as the Court determines to be appropriate.

## COUNT IX
## DECLARATORY AND INJUNCTIVE RELIEF

207.    Plaintiff re-alleges and incorporate by reference all preceding allegations as if fully set forth herein.

208.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the statutes described in this Complaint.

209.    An actual controversy has arisen in the wake of the Data Breach regarding Defendant's present and prospective common law and statutory duties to reasonably safeguard its customers' sensitive personal information and whether Defendant are currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches. Plaintiff alleges that Defendant's data security practices remain inadequate.

210.    Plaintiff and Class Members continue to suffer injury as a result of the compromise of their sensitive personal information and remain at imminent risk that further compromises of their personal information will occur in the future.

211.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that Defendant continues to owe a legal duty to secure consumers' sensitive personal information, to timely notify consumers of any data breach, and to establish and implement data security measures that are adequate to secure customers' sensitive personal information.

212.    The Court also should issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with law and industry standards to protect consumers' sensitive personal information.

213.    If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, for which they lack an adequate legal remedy. The threat of another data breach is real, immediate, and substantial. If another breach at NCB occurs, Plaintiff and Class Members will not have an adequate remedy at law because not all of the resulting injuries are readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

214.    The hardship to Plaintiff and Class Members if an injunction does not issue greatly exceeds the hardship to Defendant if an injunction is issued. If another data breach occurs at NCB, Plaintiff and Class Members will likely be subjected to substantial risk of identity theft and other damages. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

44

215.    Issuance of the requested injunction will serve the public interest by preventing another data breach at NCB, thus eliminating the additional injuries that would result to Plaintiff and the hundreds of thousands of consumers whose confidential information would be further compromised.

## REQUEST FOR RELIEF

Plaintiff, on behalf of all others similarly situated, requests that the Court enter judgment against NCB including the following:

A.    Determining that this matter may proceed as a class action and certifying the Class asserted herein;

B.    Appointing Plaintiff as representative of the applicable Class and appointing Plaintiff's counsel as Class counsel;

C.    An award to Plaintiff and the Class of compensatory, consequential, statutory, restitution, and treble damages as set forth above;

D.    Ordering injunctive relief requiring Defendant to, among other things: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems; (iii) provide lifetime credit monitoring and identity theft insurance to all Class Members; (iv) timely notify consumers of any future data breaches; and (v) delete or destroy any legacy consumer data that it is not necessary to keep for business purposes;

E.    Entering a declaratory judgment stating that Defendant owes a legal duty to secure customers' sensitive personal information, to timely notify consumers of any data breach, and to establish and implement data security measures that are adequate to secure sensitive personal information;

F.    An award of attorneys' fees, costs, and expenses, as provided by law or equity;

G.      An award of pre-judgment and post-judgment interest, as provided by law or equity; and

H.      Such other relief as the Court may allow.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

DATED: March 31, 2023                    */s/ Anthony M. Christina*

Christian Levis
Amanda G. Fiorilla
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Fax: (914) 997-0035
clevis@lowey.com
afiorilla@lowey.com

Anthony M. Christina
PA ID# 322528
**LOWEY DANNENBERG, P.C.**
One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, PA 19428
Telephone: (215) 399-4770
Fax: (914) 997-0035
achristina@lowey.com

*Counsel for Plaintiff Ernesto Medina*